1  Andrew D. Skale (SBN 211096)
   adskale@mintz.com
2  Ben L. Wagner (SBN 243594)
   blwagner@mintz.com
3  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
   3580 Carmel Mountain Road, Suite 300
4  San Diego, CA 92130
   Telephone:  858-314-1500
5  Facsimile:   858-314-1501

6  Attorneys for Plaintiff,
   BUSTED TRANNY PRODUCTIONS, LTD.

7

8              UNITED STATES DISTRICT COURT

9      SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO DIVISION

10  BUSTED TRANNY PRODUCTIONS,        Case No.  '15CV0569 BAS NLS
    LTD.,
11                                    COMPLAINT
                    Plaintiff,
12                                    Date:   02/26/2015
          v.                          Time:
13                                    Judge:
                                      Room:
14  ECHO BRIDGE ENTERTAINMENT,
    LLC and ALLIANCE ATLANTIS         Complaint Filed:
15  INTERNATIONAL DISTRIBUTION,       Trial Date:
    LLC,
16
                    Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff BUSTED TRANNY PRODUCTIONS, LTD. ("BTP") for its complaint against defendants ECHO BRIDGE ENTERTAINMENT, LLC ("EBE") and ALLIANCE ATLANTIS INTERNATIONAL DISTRIBUTION, LLC ("AAID") (collectively "Defendants"), alleges as follows:

## THE PARTIES

1. Plaintiff BTP is a Canadian limited company with its principal place of business located at 1625 Shelbourne St. SW Calgary, AB T3C 2L2.

2. On information and belief, Defendant EBE is a Delaware limited liability company with its principal place of business located at 75 Second Avenue, Suite 500, Needham, MA 02494.

3. On information and belief, Defendant AAID is a Delaware limited liability company with its principal place of business located in Needham, MA 02494.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over the claims and causes of action asserted in this complaint pursuant to 28 U.S.C. § 1332 because this dispute is between citizens of complete diversity, including Delaware companies with their headquarters in Needham, MA, and a Canadian company with its headquarters in Alberta, Canada, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. In addition, because this action arises under the copyrights laws of the United States, this court had subject matter jurisdiction pursuant to the provisions of 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (copyright).  This court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. §1367(a) as to the additional claim of breach of contract that is related to the foregoing claims in the action within the court's original jurisdiction, since it forms part of the same case or controversy under Article III of the United States Constitution.

6. This Court has personal jurisdiction over Defendants because Defendants have extensive minimum contacts with the State of California such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.  Defendants have an office in California and have purposefully availed themselves to the privileges and the laws of California, and continuously, systematically, and purposefully conduct business within this District, including

but not limited to offering for sale and selling digital media and the motion picture entitled "FUBAR."

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391 and 28 U.S.C. §1400(a) because a substantial part of the events or omissions giving rise to the claims occurred in this district and the Defendants reside in this district by virtue of being subject to personal jurisdiction in this judicial district by, among others, their repeated availment and direction of their activities toward this district.

## FACTUAL BACKGROUND

**(a)     The Distribution Agreement**

8.     Effective June 20, 2001, BTP, on one hand, and Odeon Films, Inc. ("Odeon"), on the other hand, entered into an agreement (the "First Agreement") for the acquisition by Odeon of certain distribution rights in the theatrical motion picture "FUBAR" (the "Production").  A true and correct copy of the First Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

9.     Effective June 1, 2004, BTP, on one hand, and Odeon, on the other hand, executed an amendment to the First Agreement (the "Amendment") whereby BTP and Odeon agreed to expand the scope of Odeon's exclusive rights under the First Agreement.  The Amendment ratifies all other provisions of the First Agreement.  A true and correct copy of the Amendment is attached hereto as **Exhibit B** and is incorporated herein by reference.

10.     The First Agreement and the Amendment (collectively, the "Agreement") create a binding contact between BTP, on one hand, and Odeon, on the other hand.

11.     On information and belief, the Agreement was assigned by Odeon to AAID.

12.     On information and belief, EBE acquired AAID.

13.     BTP performed all obligations required of it under the Agreement.

14.     The Agreement granted Defendants the "sole and exclusive right to exhibit, distribute and license" the Production in Canada, the U.S.A., the UK, Spain, France, and French speaking Europe (the "Territory"). Exhibit A, Schedule A, Section 1, ¶ (i); Exhibit B, Section 1.

/ / /

15.     In exchange, under the Agreement, Defendants agreed they would "in good faith distribute and exploit the Production and use [their] best efforts to obtain as wide and complete distribution of the Production through the Territory as is reasonably possible consistent with sound business policy."  Defendants also agreed to "meaningfully consult with [BTP] with respect to the advertising, marketing and distribution of the Production." Exhibit A, Schedule A, Section 6.

16.     Under the Agreement, Defendants agreed to pay BTP certain percentages of Gross Receipts they received from distribution of the Production under the Agreement as a royalty payment, including, but not limited to a percentage for DVD sales.  Exhibit A.

17.     A DVD version of the Production exists and is being marketed in the United States through vendors including, but not limited to, Amazon.com. A true and correct copy of the Production for sale on Amazon.com is attached hereto as **Exhibit C** and is incorporated herein by reference.

18.     BTP has received extremely low royalty payments from Defendants under the Agreement.  Defendants are either withholding from BTP amounts due under the Agreement, or alternatively Defendants' Gross Receipts from distribution of the Production are extremely low.

    a.   Outside of the territory in the Agreement, in Canada alone, the Production grossed $1,079,244 (CAN), which equals $848,662 (US), in DVD sales.

    b.   While Defendants have received Gross Receipts from DVD sales of the Production in the United States, BTP has received $0 in royalties from DVD sales of the Production in the United States.  Defendants have failed to pay BTP any amounts due under the Agreement relating to Defendants' DVD sales of the Production in the United States.  Such failure constitutes a breach of the Agreement.

    c.   Defendants have failed to use "best efforts to obtain as wide and complete distribution of the Production" in the United States, as required by the Agreement. Exhibit A, Schedule A, Section 6.  Such Failure by Defendants constitutes a breach of the Agreement.  For example, while pointing to the posting of the Production on Amazon, the Amazon printout tells consumers that there are only 2 copies available for purchase.

19.     Under the Agreement, Defendants agreed to "make and deliver to [BTP] reports relating to the Production in which there shall be set forth statements of all gross receipts and expenses in connection with the production. . . . Such Reports shall be delivered quarterly for the first 2 years . . . and semi-annually thereafter." Exhibit A, Schedule A, Section 17(a). Yet sufficient reports have not been provided to BTP.

**(b)   Notice Given to Defendants**

20.     On January 7, 2015, BTP provided Defendants written notice of Defendants' breaches under the Agreement. A true and correct copy of the notice letter from BTP's counsel to EBE's counsel is attached as **Exhibit D** and is hereto incorporated by reference.

21.     Counsel for EBE responded in a letter dated January 12, 2015, with EBE making no attempt to cure the breaches.

**(c)   Distribution of Production and Production's Sequel by AAID and EBE**

22.     BTP is, and at all relevant times has been, the owner of United States Registered Copyright Nos. PA00011003005 and PA0001779907, in the Production and the Production's sequel, FUBAR II, (the "Copyrighted Productions"), respectively.

23.     Among the exclusive rights granted to BTP under the Copyright Act are the exclusive rights to reproduce the Copyrighted Productions and to distribute the Copyrighted Productions to the public.

24.     If the Agreement was not validly transferred to AAID and/or EBE, then AAID and EBE do not have any license, authorization, permission or consent to use the Copyrighted Productions.

25.     As a result, AAID and EBE have, and continue to, infringe the Copyrighted Productions by copying and distributing them to the public, and/or to making the Copyrighted Productions available for distribution to others.

26.     BTP is informed and believes that the foregoing acts of infringement have been willful and intentional, in disregard of and with indifference to BTP's rights.

/ / /

/ / /

## FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

27.     BTP realleges all allegations in this Complaint as if stated herein.

28.     To the extent AAID and EBE can establish that they are successors in interest to Odeon under the Agreement, BTP brings this breach of contract claim.

29.     The Agreement forms a valid and enforceable contract between BTP and Defendants.

30.     Defendants committed unexcused and unjustified breaches of the Agreement by, among other things, the breaches specified above.

31.     Each of these breaches constitute material breaches of the Agreement that go to the heart of the Agreement and without which BTP would not have entered into the Agreement with Defendants, particularly given the exclusive nature of the Agreement.  BTP relied on each violated provision of the Agreement as essential to the Agreement because it granted Defendants exclusive rights to its Production while providing it the necessary mechanisms to receive the consideration which it was due under such grant of rights.

32.     As a direct and proximate result of Defendants' breaches, BTP has been damaged and is entitled to recover compensatory damages of at least $850,000 (USD) plus other damages in an amount to be proven at trial.

33.     BTP is also entitled to termination of the Agreement, and recovery of the exclusive rights previously granted under the Agreement.

34.     As a result of bringing this action, BTP has incurred costs, expenses and fees, and as the prevailing party is entitled to recover reasonable costs and fees pursuant to the Agreement.

### SECOND CLAIM FOR RELIEF

### COPYRIGHT INFRNIGEMENT

35.     BTP realleges all allegations in this Complaint as if stated herein.

36.     To the extent AAID and EBE are not successors in interest under the Agreement, BTP brings this alternative claim against them for copyright infringement.  Their activities alleged above with respect to the Copyrighted Productions were thus unauthorized and thus constitute

1 | copyright infringement.

2 | 37. As a result of AAID and EBE's infringement of BTP's copyrights and exclusive

3 | rights under copyright, BTP is entitled to statutory damages pursuant to 17 U.S.C. § 504(c) for

4 | AAID and EBE's infringement of each of the Copyrighted Productions. BTP is further entitled to

5 | its attorneys' fees and costs pursuant to 17 U.S.C. § 505. BTP is also entitled to its damages in an

6 | amount to be established at trial, but not less than $850,000 (USD).

7 | 38. The conduct of AAID and EBE is causing and, unless enjoined and restrained by this

8 | Court, will continue to cause BTP great and irreparable injury that cannot fully be compensated or

9 | measured in money. BTP has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503,

10 | BTP is entitled to injunctive relief prohibiting AAID and EBE from further infringing BTP's

11 | copyrights.

12 | **PRAYER FOR RELIEF**

13 | WHEREFORE, Plaintiff prays the Court:

14 | 1. Enter a judgment in favor of Plaintiff against Defendants on all counts;

15 | 2. Enter an order terminating the Agreement along with an order enjoining any further

16 | distribution of the Production under the Agreement;

17 | 3. Enter temporary, preliminary, and permanent injunctive relief barring Defendants

18 | from making any further distribution of the Production;

19 | 4. Order an accounting, including without limit Defendants complete provision of the

20 | information specified to be provided in the Agreement;

21 | 5. Award to Plaintiff compensatory damages of at least $850,000 arising from

22 | Defendants' breach of contract, or in an amount determined by the Court;

23 | 6. Enter temporary, preliminary, and permanent injunctive relief barring AAID and

24 | EBE from making any further distribution of the Copyrighted Productions;

25 | 7. Award Plaintiff statutory damages for each infringement of the Copyrighted

26 | Productions pursuant to 17 U.S.C. § 504;

27 | 8. Award Plaintiff its cost and fees as provided by the Agreement and as otherwise

28 | allowed under the law; and

9.      Award to Plaintiff such other and further relief as this Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any issues triable of right by a jury.

Respectfully submitted,

DATED:  March 12, 2015                    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.


                                          /s/ Andrew D. Skale
                                          By:     Andrew D. Skale
                                                  Ben L. Wagner
                                                  Attorneys for Plaintiff
39566888v.1                                       BUSTED TRANNY PRODUCTIONS, LTD.

# EXHIBIT A



June 20, 2001

Busted Tranny Productions Ltd.
113 - 1215 13ᵗʰ Street SE
Calgary, Alberta
T2G 3J4

Attention: Michael Dowse
Telecopier #: 403-237-0146

Dear Michael:                · Re: *"FUBAR"*

This letter will serve to confirm the terms and conditions of the agreement reached between Busted Tranny Productions Ltd. ("Producer") and Odeon Films Inc. ("Distributor") for the acquisition by Distributor of certain distribution rights in the theatrical motion picture *"FUBAR"* (the "Production").

1.      The Production will be a 75-110 minute (picture to picture) theatrical motion picture shot on MiniDV and blown up to 35 mm.  Principal photography has commenced and delivery to Distributor of those items specified in Schedule "B" attached hereto will be on or before February 1, 2002 ("Delivery"), failing which Distributor shall have the option of extending the applicable dates or declaring this Agreement null and void, in which case all amounts paid to Producer shall be repayable forthwith, with interest.  The budget will be no less than $425,000.  The Production will qualify as a Canadian Film or Video Production as defined in the Income Tax Act (Canada).

2.      Producer hereby grants, sells and assigns to Distributor throughout the world (the "Territory"), the rights set out in paragraphs 1 and 24 of the Standard Terms appended hereto as Schedule "A", for a period commencing on the date hereof and ending 25 years from Delivery (the "Term").  At the end of the Term, Distributor shall have the right to extend the Term at its option for a further 25 year term on the same terms as described herein (but with no further minimum guarantee being payable).

3. (a) Distributor shall be entitled to retain the following percentage of the Gross Receipts it receives from the distribution of the Production in Canada as a distribution fee:
          - theatrical - 35%
          - for PPV, pay, cable, and network T.V. - 25%
          - for other television including syndicated T.V. - 35%
          - for non-theatrical (including inflight) - 50%
          - for retransmission royalties - 25%
          - for linear CD-ROM and CDI - 25%
          - other media, including new media - to be negotiated
          - for video sales, Producer's share shall be 20% of the wholesale selling price of each video sold, provided that in the event that the wholesale selling price is at or less than the typical sell-through price to wholesalers (currently $30 per unit), Producer's share shall be 10%. AAMPD will bear the cost of all video distribution expenses from AAMPD's share of video receipts other than the cost of duplication (currently approximately $3 per unit) which shall be a recoupable distribution expense. AAMPD shall be entitled to recover any unrecouped distribution expenses incurred hereunder (other than video distribution expenses) and any unrecouped portion of the Minimum Guarantee (as hereinafter defined) from Producer's share of video receipts.

(b) Distributor (or its affiliates) shall be entitled to retain as a distribution fee thirty-five percent (35%) of the Gross Receipts it receives from the distribution of the Production throughout the world, excluding Canada and the U.S., and twenty percent (20%) of the Gross Receipts it receives from the distribution of the Production in the U.S. Such distribution fees shall be inclusive of commissions paid to sub-agents and sub-distributors (other than local distributors).

(c) Notwithstanding paragraph 5 of the Standard Terms, only Producer's share of the Retransmission Royalties shall be considered Gross Receipts i.e. Distributor shall only be entitled to a fee in respect of Producer's share, but calculated as if the proportion of the Retransmission Royalties required to be remitted to the Canadian Film Development Corporation ("Telefilm") does not exceed the proportion of its copyright ownership in the Production. Distributor shall not be entitled to apply Telefilm's share of retransmission royalties to recoup its expenses or the Minimum Guarantee, but shall pay such share directly to Telefilm without deduction.

4.      Conditional upon Producer complying with all of its obligations hereunder including, without limitation, Producer having satisfied the conditions precedent set out in subparagraph 10(b) of Schedule "A", Distributor agrees to pay $90,000 as a minimum guarantee for Canada (the "Minimum Guarantee") The Minimum Guarantee shall be payable as follows:

    (i)    25% ($22,500) upon execution of this Agreement and receipt and approval by Distributor of proof of full financing of the approved budget of the Production;

    (ii)   50% ($45,000) on approval by Distributor of the picture lock of the Production; and

    (iii)  25% ($22,500) on acceptance by Distributor of Delivery.

Distributor shall be entitled to recoup the Minimum Guarantee in first position from the balance of Gross Receipts derived from the Production in Canada after payment of distribution fees and expenses.

5.      Distributor may only sub-license or assign the right to distribute the Production in any Canadian market or medium to a Canadian-owned and controlled distributor or sub-distributor.

6. Distributor agrees that it will cause the Production to be released theatrically in Canada. The scope of such theatrical release shall be at Distributor's sole discretion in accordance with sound business policy.

7.      Distributor agrees to submit to Telefilm Canada a national distribution plan covering both the English and French languages.

8.      Distributor agrees to keep all records and accounts relating to, and revenues derived from Canadian distribution of the Production separate from those relating to foreign distribution of the Production.

9.      The first sentence of paragraph 8 of the Standard Terms shall be deleted and replaced with the following:

    8.   In consideration of the rights, licenses and privileges herein granted to Distributor, it is  agreed that the Gross Receipts derived from the exhibition, distribution and exploitation of the Production shall be apportioned and paid as follows:  the balance of the Gross Receipts, after deduction of the distribution fees as set out in the Agreement to which this Schedule "A" is appended and expenses (which shall be those standard in the industry), and after recoupment of the Minimum Garantee plus interest as calculated below, shall be paid to Producer.  Interest shall be calculated only on that portion of the Minimum Guarantee not being reimbursed through the Telefilm Distribution Fund at an annual rate equal to the Royal Bank of Canada Prime Rate as set from time to time plus 2%, calculated and compounded monthly from the date(s) of advance of the Minimum Guarantees to the earlier of (i)  the date of recoupment by Distributor of the Minimum Guarantee, or (ii)  the date 60 days after the date Distributor have received notice from Producer of the availability for delivery of the answer print of the Production.

'.    All synchronization and master recording licenses must include use in all media in all territories ¬prising the Territory for the entire Term and Producer shall ensure that (i) all original music contained in the ¬ure for the Production shall be cleared for use in trailers and ads and (ii) a minimum of two (2) source songs (which shall be pre-approved by Distributor) shall be cleared for use in trailers and ads.

11.    Schedules "A" (Standard Terms), "B" (Delivery Items), and "C" (Lab Access Letter) appended hereto, form a part of this Agreement.


If the foregoing is consistent with your understanding, please acknowledge your acceptance of these terms by executing below, and return a fully executed copy to my attention.

Yours truly,

ODEON FILMS INC.

Per:

ACCEPTED AND AGREED TO:

BUSTED TRANNY PRODUCTIONS LTD.

Per:

## SCHEDULE "A"

### STANDARD TERMS

1.    Producer hereby irrevocably grants, sells and assigns to Distributor for exploitation in all languages throughout the Territory for the Term as set out in the Agreement to which this Schedule is appended:

(i)    the sole and exclusive right to exhibit, distribute and license the exhibition and distribution of the Production in all media including, without limitation, theatrically and non-theatrically, by means of pay television, cable television and free television, and in the form of video cassettes, video discs, and all other manners of home viewing and all methods of transmission and delivery, now or hereafter invented or devised, including but not limited to CD-ROM and CD-I in a linear format with or without additional material, without limitation or without reservation;

(ii)   the right to collect retransmission royalties payable to Producer in respect of the Production on Producer's behalf;

(iii)  all rights (including the entire right, title and interest in and to the copyrights, administration rights and similar rights therein and thereto) in and to any and all music, including title, music and lyrics (other than so called "source music") used in the Production (the "Music Publishing Rights").

(iv)  a right of first negotiation (30 days) / last matching right (30 days) for Distributor or its affiliates to acquire the exclusive worldwide merchandising and publishing rights in and to the Production and the elements thereof;

(v)   a right of first negotiation (60 days) / last matching right (30 days) for Distributor or its affiliates to acquire the exclusive worldwide right to produce and distribute the soundtrack album of the Production, such negotiations to commence no sooner than Delivery of (i) a DAT copy of the full, complete score of the Production; (ii) a DAT copy of all source music to be included in the Production; (iii) a VHS copy of the Production as completed on the date of Delivery of items (i) to (ii); and (iv) any other material details related to the Production, to include, but not be limited to, the cast, marketing plans, and known pre-sales; and

(vi)  the right to use the names, photographs, likenesses, biographies and voices of the director, musicians, writers, composers, authors, all members of the cast and all other persons rendering services in connection with the Production in advertising and publicizing the Production and in exploiting, advertising and publicizing any ancillary and related rights related to the Production.

2.    Distributor shall be entitled to enter into license agreements in which the grant of rights extends beyond the Term.

3.    The Territory shall include the countries comprising the Territory; their respective territories and possessions; their military installations; ships and planes flying their flags; and oil rigs, wherever situated, owned by their residents.

4.    Producer hereby represents and warrants that it has sole and unrestricted power and authority to enter into this Agreement, that it controls all necessary rights in order to grant the rights granted herein, that it has and will pay when due all residuals, royalties, re-use payments and similar amounts owing or which will be owed in the future to any and all third parties, including grantors of underlying rights, writers of the script, musicians, cast and crew, that neither the Production nor any part thereof, or the exercise by any authorized party of any of the rights granted herein, will violate or infringe upon the trademark, trade name, copyright, patent or any other similar right, or defame or violate any rights of privacy or publicity, moral rights or any other right of any person, firm or corporation. Producer further represents and warrants that it has complied with all credit obligations, whether they arise contractually or through the provisions of a guild agreement.

5.      Producer covenants and agrees that it will, at its cost and expense, indemnify and hold Distributor, its sub-licensees and any exhibitors or broadcasters of the Production, harmless from all loss, damages, costs or expense, including court costs and reasonable solicitor's fees, which may result from or by reason of any demand, claim, suit or proceeding which may be made or brought against Distributor, its sub-licensees or exhibitors by reason of any breach by Producer of the warranties and representations set forth in this Agreement, provided, however, the Distributor agrees to give to Producer prompt notice of all claims, the right to participate in the defence of such claims and undertakes not to conclude any settlement without the consent of the Producer, such consent not to be unreasonably withheld.

6.      Distributor accepts the license herein granted to it and will in good faith distribute and exploit the Production and use its best efforts to obtain as wide and complete distribution of the Production throughout the Territory as is reasonably possible consistent with sound business policy.  Distributor shall have sole charge and control of the manner in which and the terms upon which the Production shall be marketed and distributed, including the right to make alterations to the Production to comply with standards and practices of broadcasters, to comply with governmental censorship requirements, to create foreign language versions of the Production or to accommodate television timing requirements.  Distributor agrees to meaningfully consult with Producer with respect to the advertising, marketing and distribution of the Production.

7.      The term "Gross Receipts" as used in this Agreement shall mean and include all sums received by Distributor for any right or license to exhibit, broadcast, sell, rent or otherwise exploit the Production.  Any and all advances paid by the exhibitors or any other party form part of "Gross Receipts" when such advances are received by Distributor, if non-returnable, otherwise when received and earned by Distributor.

8.      In consideration of the rights, licenses and privileges herein granted to the Distributor, it is agreed that the Gross Receipts derived from the exhibition, distribution and exploitation of the Production shall be apportioned and paid as follows: the balance of the Gross Receipts, after deduction of the distribution fees as set out in the Agreement to which this Schedule "A" is appended and expenses (which shall be those standard in the industry), and after recoupment of the Minimum Guarantee plus interest at an annual rate equal to the Royal Bank of Canada Prime Rate as set from time to time plus 2%, calculated and compounded monthly from the date(s) of advance to the date of recoupment, shall be paid to Producer.

9.      Distributor shall not cross-collateralize the revenues or expenses related to the Production with any other television program or film, but if Canadian and foreign rights are granted herein, shall be entitled to fully cross collateralize Canadian and all foreign revenues and expenses related to the Production.

10.(a)   Producer shall provide Distributor with an audited accounting statement of the actual cost of production of the Production upon completion, and if the actual cost is less than the approved final budget amount hereunder, Producer shall forthwith pay to Distributor (or Distributor shall deduct from any portion of the Minimum Guarantee not yet paid) a portion of the difference between the actual production costs and the approved final budget, in the same proportion that the Minimum Guarantee is to such approved final budget.

(b)     If any portion of the Minimum Guarantee is payable prior to Delivery, such portion shall not be payable hereunder unless and until Producer has provided to Distributor each of the following in form satisfactory to Distributor in its sole discretion:

   (i) chain of title documentation;
   (ii) evidence that Producer is in compliance with paragraph 23 hereof; and
   (iii) evidence that commitments are in place to fully finance the production of the Production in accordance with the approved final budget.

11.     Delivery shall consist of delivery at Producer's expense of the items set out in Schedule "B" herein.

12.     Distributor will not alter or knowingly permit to be deleted any of the credits which appear upon the Production or which will appear in all advertising, exploitation and publicity to be issued by Distributor.  Nothing herein shall prohibit Distributor from adding its own credit as distributors to the Production and to advertising, exploitation and publicity for the Production.  No casual or inadvertent failure of Distributor to comply with the provisions of this paragraph shall constitute a breach of this Agreement.  In the event of a failure on the part of

Distributor or any third party to comply with this paragraph, Distributor's sole obligation shall be to take all reasonable steps to prospectively cure such failure after receipt from Producer of notice of such failure.

13.     Distributor may make and exhibit, and allow sub-distributors to make and exhibit, dubbed or superimposed (subtitled) foreign language versions of the Production. Distributor agrees to and shall indemnify Producer and hold Producer harmless against any claim, causes of action, liability and expense in any way arising out of or in connection with the dubbing or superimposing of the Production, or the exhibition thereof in its dubbed or subtitled form.

14.     Producer shall take all steps and pay any fees necessary or required by law in the Territory to protect the Production by copyright.

15.     As a recoupable cost to Distributor, Distributor shall have the right to order from Producer or from its designee, such prints, tapes, advertising and publicity materials, including promo reels of the Production, as shall be available to Producer and to manufacture or cause to be manufactured such advertising and publicity material as they deem necessary for exhibition, distribution and exploitation of the Production. Distributor shall have access to all promotional and publicity materials and promo reels created by any other distributors of the Production, if any, at the duplication cost of materials.

16.     Distributor shall keep and maintain at its offices complete, detailed, permanent and accurate books of account and other records relating to the exhibition, distribution and exploitation of the Production. Said books of account and records shall be kept and maintained under a standard system customarily used in the motion picture and television industry. During the Term and for a period of two (2) years after the expiration thereof, Producer (through a Chartered Accountant or Certified Public Accountant) shall have access (no more frequently than once per year) on reasonable written notice and during customary business hours to all said books and records insofar as they relate to the Production and the exhibition, distribution and exploitation thereof, subject to the provisions of paragraph 17(b) herein.

17.(a)   Distributor shall make and deliver to Producer reports ("Report" or "Reports") relating to the Production in which there shall be set forth statements of all gross receipts and expenses in connection with the Production. Each such Report shall be delivered to Producer no later than sixty (60) days following the accounting period for which the same relates and each statement shall be accompanied by a remittance to Producer of the amount due and payable to Producer in Canadian funds pursuant to the terms of this Agreement. Such Reports shall be delivered quarterly for the first 2 years following Delivery and semi-annually thereafter. Distributor shall have the right to withhold from the aforesaid and from any and all other payments to be made hereunder, such taxes as may be prescribed under the laws of Canada as modified by any applicable Tax Convention. Distributor shall be entitled to withhold for one year following every payment, a reserve of ten per cent of the payments received for additional technical delivery requirements which may be required.

(b)     Any objection of Producer to any item or information in any Report must be delivered in writing to Distributor within two (2) years of the date of such Report or be thereafter barred, including any action or proceeding based thereon. If an objection is not resolved amicably, Producer may institute an action with respect to such objection, provided that such action is commenced within six (6) months after the expiration of said two (2) year period. The inclusion in any Report of transactions or items which have appeared in a previous Report shall not renew or extend the time for objections or the time within which an action based on such transaction or item can be brought. Distributor's books of account and all supporting documents need not be retained or preserved and Producer shall not have access to all said books and records beyond said two (2) year period unless Producer has timely objected and instituted an action.

18.     Title in and to the Production and any and all positive prints and tapes thereof which may be acquired by or come into the possession of Distributor and any other rights, materials or properties pertaining to the Production coming into the possession of Distributor shall immediately upon coming into existence or being procured by Distributor, vest in Producer, subject only to the rights of Distributor under the terms of this Agreement. No print or tape of the Production or other materials or properties pertaining thereto shall be sold by or through Distributor, except for the sole purpose of exhibition pursuant to the terms of this Agreement.

19.     None of the parties hereto shall be deemed to be in default hereunder for any delay or failure of performance on the part of any of said parties due to act of God, war (declared or undeclared), the elements,

strikes, labor difficulties, delay in or lack of transportation, shortages of material, or similar circumstances beyond the control of any party, nor shall any party be liable for any failure, misfeasance, malfeasance or non-feasance of any carrier, transportation agency, laboratory or any other persons, firms or corporations, or for any causes not within the reasonable control of either party, or for any action, omission or delay not directly due to the negligence or default of such party or its authorized employees.

20.     Distributor shall have the right to approve all on screen and paid ad credits, music supervisor, all source music, the rough assembly, fine cut and broadcast-ready tape, and all press releases and promotional materials.

21.     Producer shall ensure that all publicity and promotional materials issued by it concerning the Production make prominent mention of the role of Distributor in its financial and other support of the Production. Distributor shall receive a full card sole presentation credit at the beginning of the credit sequence at the beginning of the Production and superimposed over the first action sequence (unless no credits are superimposed over the first action sequence) and in all paid advertising, substantially as follows: "Alliance Atlantis Presents". In addition, a person or persons designated by Distributor shall be entitled to the sole Executive Producer credit, such credit to appear on a separate card in the main credits and in all paid advertising. Producer shall ensure that Distributor has a reasonable opportunity to approve the placement, style and wording of this credit, which shall not be shot until specifically approved by Distributor.

22.     Intentionally deleted.

23.     Producer agrees to maintain with an insurer approved by Distributor for a term of 3 years from the start of principal photography, an industry standard Errors and Omissions Insurance Policy for the Production with limits of no less than $1,000,000 per claim and $3,000,000 in the aggregate with a deductible of no more than $10,000, with no exclusions, and including coverage for the title. Producer agrees to cause Distributor and its respective officers, directors, employees, licensees, etc. to be added as additional insureds on the said policy. Producer shall provide Distributor with an executed completion guarantee satisfactory to Distributor, naming Distributor as beneficiaries, under the provisions of which the guarantor undertakes to provide such sums in excess of the final budget, if any, as are necessary to complete and deliver the Production to Distributor. Producer shall also provide Distributor with evidence of production insurance satisfactory to Distributor, naming Distributor as additional insureds.

24.     Producer hereby grants to Distributor the exclusive right of first negotiation/ last matching right to distribute all theatrical motion picture sequels, prequels, remakes, movies of the week, mini-series, television series and any linear or non-linear interactive programs of any kind (including programs on CD-ROM and CD-I, video games, etc.) based on, adapted from or in any way derived from the Production and/or any underlying rights upon which the Production is based including the title thereof (a "Subsequent Production"). Accordingly, in the event that Producer elects to produce a Subsequent Production, Producer shall forthwith notify Distributor in writing and thereupon Producer and Distributor shall negotiate in good faith to conclude an agreement whereunder Distributor shall acquire worldwide distribution rights in and to such Subsequent Production; provided that in the event that Producer and Distributor fail to conclude an agreement within 30 days from the commencement of negotiations, Producer shall be free to enter into an agreement with a third party in connection with the exploitation of any rights in and to such Subsequent Production, provided that Distributor shall have the right to match the material terms and conditions of any such agreement for a period of 10 business days from the date of written receipt of such terms and conditions from Producer, and Producer shall not enter into any agreement with such third party until Distributor has notified Producer of its decision whether or not to match or the matching period has expired and Distributor have failed to respond. Distributor shall not be required to match any terms that cannot be met by one person as easily as another, such as employment of a particular individual or the engagement of a particular sub-licensee or sales agent.

25.     "Dollars" as used herein, unless otherwise provided, shall mean Canadian Dollars and all payments shall be subject to applicable withholding taxes. To the extent the G.S.T. applies, it shall be in addition to all amounts set forth in this Agreement. Producer 's GST Registration number is ___97387 5215___.

26.     This Agreement is whole and complete and no warranties, representations or agreements have been made by any of the parties to the other except as herein expressly set forth. This Agreement may not be amended or modified except by a writing signed by both Producer and Distributor or their duly authorized

representatives. If the terms of any other agreement between the parties hereto conflict with this Agreement, the terms of this Agreement shall prevail.

27.     This Agreement shall be construed and interpreted according to the laws of the Province of Ontario and the laws of Canada applicable therein, and each party agrees to submit to the jurisdiction of the Courts of the Province of Ontario and to accept service of documents relating to commencement of proceedings and actions by certified or registered mail.

28.     Any and all notice or payments which any party shall desire or be required to give to the other shall be in writing and delivered by hand or telecopier addressed to the parties at the addresses set out in the agreement or to such other address as any party may designate by written notice to the others during the Term hereof.

29.     This Agreement shall enure to the benefit of and be binding upon the parties hereto, their respective successors and, subject to the provisions of this Agreement, assigns. Distributor shall have the right to assign all of its right, title and interest under this Agreement to any financial institution or its assignees without consent. Notwithstanding the foregoing, Distributor will continue to remain primarily liable for all of Distributor's obligations under this Agreement.

30.     The terms of this Agreement shall remain confidential between the parties and there shall be no communication to the public relating to this Agreement or to the relationship of the parties hereto without the prior consent of all parties.

## SCHEDULE "B"

### DELIVERY SCHEDULE

Unless otherwise directed, all film, audio and video elements should be shipped to:

Alliance Atlantis Motion Picture Distribution, 121 Bloor Street East, Toronto, Ontario, Canada M4W 3M5
Attn: Scott Cole   Tel: 416 966 7739   Fax: 416 967 6308.
Email: scott.cole@allianceatlantis.com

Unless otherwise directed, all documentation should be shipped to:

Alliance Atlantis Motion Picture Distribution, 121 Bloor Street East, Toronto, Ontario, Canada M4W 3M5
Attn: Jason Wodlinger   Tel: 416 934 5220   Fax: 416 967 6308
Email: jason.wodlinger@allianceatlantis.com

Section A:

### PRODUCTION ELEMENTS

## 1.  ROUGH CUTS, DIRECTOR'S CUT, PRODUCER'S CUT
Two (2) VHS cassettes of the Production at the Director's Cut, Producer's Cut and any Revised Cut stages prior to final delivery.

## 2.  FINAL DUBS
Two (2) VHS cassettes of the finished Production WHEN READY.

Section B:

### FILM ELEMENTS

#### 1. 35MM INTERNEGATIVE
One (1) 35mm INTERNEGATIVE manufactured from the Interpositive conformed in all respects to the original negative, including complete titles at head and tail, suitable for the manufacture of first quality release prints. With alt. reels containing superimposed subtitles in English, Credit adjustments, cover shots and etc. where appropriate. Medium: Estar base 35mm.

#### 2. 35MM INTERPOSITIVE
One (1) 35mm INTERPOSITIVE manufactured from the Original Edited Negative conformed in all respects to the final Production, including complete titles at head and tail. Medium: Estar base 35mm.

#### 3. 35MM OPTICAL NEGATIVE
One (1) 35mm OPTICAL SOUND TRACK NEGATIVE of the final approved sound track in stereo (where appropriate), in synch with the finalProduction, suitable for the manufacture of first quality release prints.

#### 4. 35MM RELEASE PRINT
One (1) 35mm composite RELEASE PRINT (or check print) printed from the Internegative and English Language Optical Negative.



Section C:

## VIDEO ELEMENTS

**GENERAL GUIDELINES**

## DISTRIBUTOR'S LOGO
All Master video tapes delivered to Distributor must include the Distributor's Logo (picture and audio) at the beginning of the tape. A digital betacam copy of the Distributor's Logo is available upon request.

## CLOSED BLACKS
There should not be any formatted commercial blacks in the body of the Production (CLOSED BLACKS). Where commercial breaks have been included in the formatted master, the commercial breaks should be pulled up so that the Production runs continuously, ensuring that no Production audio or video is deleted in the process. Any BUMPERS in the Production are to be deleted from the CLOSED BLACK MASTER, but should be included with the TEXTLESS ELEMENTS at the end of the tape or on a separate Master Tape.

## DROP FRAME TIMECODE
All Video Masters must have continuous Drop Frame Timecode with the Production starting at 1:00:00:00. If possible, the Textless segments (Head & Tail Credits and Titled sections) should be placed at the end of the Production after thirty (:30) seconds of black (If not, they must be supplied on a separate Digital Betacam NTSC cassette).

All Master video tapes must have one (1) minute of Color Bars and 1000 Hz Tone, Ten (10) seconds of slate indicating the name and date of the production, the running length and whether the Textless elements are included at the end of the Production. Technically, the Production must adhere to SMPTE specifications.

The MASTER VIDEO TAPES should not use Dolby or any comparative noise reduction. Surround Sound encoding is acceptable.

## 1. INTERNATIONAL VIDEO MASTER - NTSC
One (1) Full Frame Component Digital Betacam (or D1) NTSC video tape transferred and recorded entirely in the component stream fully Color Corrected and Titled with a Full English Mix in Stereo and Stereo M & E configured as follows:

|  |  |
|---|---|
| Channel 1: | FULL MIX LEFT (LT) |
| Channel 2: | FULL MIX RIGHT (RT) |
| Channel 3: | M & E LEFT (LT) |
| Channel 4: | M & E RIGHT (RT) |

## 2. INTERNATIONAL VIDEO MASTER - PAL
One (1) Full Frame Digital Betacam (or D1) PAL video tape transferred from the Interpositive or created through an approved Image Translation Process. Audio Configuration:

|  |  |
|---|---|
| Channel 1: | FULL MIX LEFT (LT) |
| Channel 2: | FULL MIX RIGHT (RT) |
| Channel 3: | M & E LEFT (LT) |
| Channel 4: | M & E RIGHT (RT) |

## 3. CLOSED CAPTIONED PROTECTION MASTER - NTSC
One (1) Digital Betacam (or D2 on small size cassettes) NTSC Protection Master of the Closed Captioned Broadcast Master suitable for broadcast on Network television. Mix on Channels 1 & 2.

**4.  16 x 9  ANAMORPHIC VIDEO MASTER - NTSC & PAL**

One (1) Digital Betacam video tape of the Anamorphic Master (16 x 9) with the Final Approved Mix on Channels 1 & 2 and the M & E on Channels 3 & 4 in NTSC & PAL.

**5.  NON-ANAMORPHIC LETTERBOX VIDEO MASTER - NTSC & PAL**

Digital Betacam video tapes of the Non-Anamorphic Theatrical Master in the same aspect ratio as the original Theatrical Presentation (e.g.; 185:1 or 235:1) with the Final Approved Mix on Channels 1 & 2 and the M & E on Channels 3 & 4 in NTSC & PAL.

**6.  TITLE CARD VIDEO**

If applicable, One (1) Digital Betacam NTSC video tape with the Main TITLE in English over black with the Opening and Closing Music themes in Stereo on the Audio Tracks. (Music only)

**7.  TEXTLESS ELEMENTS**

If applicable, One (1) Digital Betacam NTSC video tape of any scenes in the final Production that contain Written English or other language (i.e.; Head & Tail Credits). This includes any BUMPERS created for the Production. TEXTLESS versions of the BUMPERS should be included in the TEXTLESS elements. NOTE: This can be included at the end of the International Master Tape if there is space.

**8.  MASTER VIDEO TECHNICAL EVALUATION**

One (1) copy of the final MASTER VIDEO TECHNICAL EVALUATION (MVTE) REPORT as created by International Image (or pre-approved Lab) for each video Master delivered. Should the evaluation prove that any of the master videotapes are not of acceptable quality, it is the producer's responsibility to repair any faults listed on the MVTE. This MVTE  must be submitted prior to final acceptance. If there are any faults not corrected, a written explanation accompanying the MVTE must be accepted by Distributor.

**Section D:**

### AUDIO ELEMENTS

#### 1. DA-88 M & E TRACK
One (1) DA88 6-track International MUSIC & EFFECTS SOUNDTRACK in stereo, in synch with the final Production.   (Note:  there must be no discernible English or other language on the M&E (this includes Crowd Walla and Radio Background).

Configuration:

| | |
|---|---|
| Track 1: | M & E left |
| Track 2: | M & E center |
| Track 3: | M & E right |
| Track 4: | M & E surround |
| Track 5: | Extra Dialogue, Radio, etc. |
| Track 6: | Dialogue guide (for foreign language dubbing) |

In the case of digital mixes where the master mix is on more than 6 Tracks, if available, access should include in addition the music and effects on DA88 with in a 6-track discrete format with the following configuration: -

| | |
|---|---|
| Track 1: | M & E left |
| Track 2: | M & E center |
| Track 3: | M & E right |
| Track 4: | M & E surround left |
| Track 5: | M & E surround right |
| Track 6: | M & E subwoofer |
| Track 7: | Extra dialogue, radio, etc |
| Track 8: | Dialogue guide |

#### 2. DA-88 MONO 3-TRACK MIX
One (1) DA88 MONO 3-TRACK of the film containing separate English Dialogue, Music and Sound Effects Tracks (DME).

#### 3. MUSIC DUB
One (1) copy of the FINAL MUSIC on D.A.T. or DA88 tape suitable for dubbing. The D.A.T. or DA88 should be a clone of the music as supplied by the composer before being mixed with the dialogue and sound effects.

#### 4. FINAL MIX
One (1) Fully mixed integrated MIX suitable for Television or Home Video release on D.A.T. with TIMECODE matching the International Master. The audio should be configured as follows:

| | |
|---|---|
| Channel 1: | STEREO LEFT |
| Channel 2: | STEREO RIGHT |

#### 5. M & E MIX
One (1) International MUSIC & EFFECTS SOUNDTRACK (M & E) IN STEREO In sync with the International Master on D.A.T. NOTE: There must be no discernible English on the M & E (this includes specific WALLA and RADIO BG).

| | |
|---|---|
| Channel 1: | M & E LEFT |
| Channel 2: | M & E RIGHT |

## 6.  AUDIO PROTECTION COPY

One (1) Protection copy of the FINAL ENGLISH LANGUAGE MIX on DA88 with timecode matching the International Master with the configuration as follows:

| | |
|---|---|
| Track 1: | Dialogue Left |
| Track 2: | Dialogue Right |
| Track 3: | Sound Effects & Foley Left |
| Track 4: | Sound Effects and Foley Right |
| Track 5: | Music (mixed) Left |
| Track 6: | Music (mixed) Right |
| Track 7: | Additional Dialogue (including Walla) elements Left |
| Track 8: | Additional Dialogue (including Walla) elements Right |

Note: When Tracks 1 - 6 are combined, they should reflect the complete Stereo mix.

## 7.  M & E PROTECTION MIX

One (1) Protection copy of the Stereo M & E on DA88 . The configuration as follows:

| | |
|---|---|
| Track 1: | Mono Dialogue |
| Track 2: | Mono Sound Effects & Foley |
| Track 3: | Mono Music |
| Track 4: | Extra Walla, Radio Voices Etc. |
| Track 5: | Music Left |
| Track 6: | Music Right |
| Track 7: | M & E Left |
| Track 8: | M & E Right |

## 8.  ALT. OR EDITED FOR TELEVISION MIX

If appropriate, one (1) D.A.T of the Edited for Television mix with English muted lines for any swearing. The TIMECODE must match the Video Master listed above.

| | |
|---|---|
| Channel 1: | STEREO LEFT |
| Channel 2: | STEREO RIGHT |

## 9.  ALT. OR EDITED FOR TELEVISION MIX PROTECTION

If appropriate, one (1) Protection copy of the ALTERNATIVE MIX on DA88. The Configuration should be the same as the Audio Protection Copy.

Section E:

## DOCUMENTATION MATERIAL

### 1. MUSIC CUE LIST

Two (2) copies of the final MUSIC CUE LIST, indicating title, composer, publisher, copyright owner(s), usage, performing rights society, as well as film footage and running time, for each composition of the Production, indicating background, feature, instrumental and vocal usage. Producer will not register any cue sheets with any performing rights society without Distributor's written approval.

### 2. MUSIC CUE LIST ON DISKETTE

COMPUTER DISKETTE compatible with Microsoft Word containing the final MUSIC CUE LIST specified in Item #1.

### 3. AS PRODUCED ACTION & DIALOGUE CONTINUITY AND SPOTTING LIST

One (1) AS PRODUCED SCRIPT ACTION & DIALOGUE CONTINUITY LIST, containing all final dialogue and scene descriptions of the finalProduction.

### 4. AS PRODUCED ACTION & DIALOGUE CONTINUITY AND SPOTTING LIST ON DISKETTE

COMPUTER DISKETTE compatible with Microsoft Word containing the As Produced Script Action & Dialogue Continuity List specified in Item #3.

### 5. FINAL HEAD & TAIL CREDITS

One (1) typewritten copy of the HEAD & TAIL SCREEN CREDITS as they appear in the final Production. Screen Credits are to be approved by Distributor before they are created.

### 6. FINAL HEAD & TAIL CREDITS ON DISKETTE

COMPUTER DISKETTE compatible with Microsoft Word containing the HEAD & TAIL SCREEN CREDITS specified in Item #5.

### 7. TITLE PHOTO CARD

One (1) Black and White Photocard of the main title in both French and English suitable for printing purposes. If possible, specify PMS (Pantone Matching System) colors.

### 8. TITLE ART - SYQUEST DISK

If created through a computer, one (1) Syquest disk of the Title treatment.

### 9. MUSIC LICENSES

Two (2) fully-executed copies of all synchronization, master recording & performing LICENSES for all music, incidental songs and instrumental music used in the Production. All synchronization and master recording licenses shall be for all rights, including in-context use, in perpetuity (unless otherwise agreed in writing by Distributor) and shall include an option with a pre-negotiated price for the out-of context use of the music in trailers and ads. If any music in the public domain, proof of said status shall also be delivered. Paid in full invoices are not acceptable, nor are summarized deal point memos.

### 10. SUMMARY OF MUSIC RIGHTS AND OPTIONS

A list of all the songs used in the Production against which the rights granted, term of license, media to which rights apply, details of the options for extending or exercising certain rights or terms, where Distributor's standard contract has not been used - shortfalls in the rights granted, etc. should be shown. NOTE: The minimum license for any music license is World Wide Free & Pay TV, All Video and Theatrical in perpetuity. Any reduced license must be accepted by the Distributor prior to execution.

## 11. SUMMARY OF MUSIC RIGHTS AND OPTIONS ON DISKETTE

COMPUTER DISKETTE compatible with Microsoft Word containing the Summary of Music Rights and Options specified in Item #10.

## 12. STOCK FOOTAGE LICENSES

Two (2) fully executed copies of all Stock footage licenses along with a report stipulating the period and territories included within the license agreement. NOTE: The minimum license for any stock license is World Wide Free & Pay TV, All Video and Theatrical (in the case of Theatrical Films) in perpetuity. Any reduced license must be accepted by the Distributor prior to execution.

*** If not applicable, a signed statement to this effect

## 13. TALENT RESTRICTIONS

A signed statement from the producer listing all Dubbing, Cutting and Other Restrictions applicable to the Production. If there are no restrictions, a statement to that effect.

## 14. TALENT RESTRICTIONS ON DISKETTE

COMPUTER DISKETTE compatible with Microsoft Word containing the Talent Restrictions in Item #13.

## 15. E & O INSURANCE

E & O INSURANCE shall be US $1 million per claim, US $3 million in aggregate; deductible of $10,000, for a term of three (3) years commencing on the first day of principal photography of the Production naming Distributor and its respective officers, directors, and employees as an additional insured. The policy must have no exclusions and shall include coverage for the title and music.

## 16. LABORATORY ACCESS LETTERS

The Laboratory Access Letters should be set out in a manner that gives the distributor unrestricted access to all the relevant elements. (see Schedule 'C', attached).

## 17. COMPLETION GUARANTEE

One (1) copy of the Completion Guarantee certificate (if applicable).

## 18. CREDIT STATEMENT

A signed STATEMENT of contractual screen credits paid advertising credits, names/likeness obligations and talent approvals applicable to the Production. The statement should include each credit in one column and summaries of the credit obligation in the adjacent columns for: on-screen and paid ad obligations, including form, placement, type size and exclusions; and names/likeness obligations and approval obligations, indicating any contractual approval entitlements or other names/likeness obligations. If there is no obligation to accord a certain credit which has been accorded on screen or is included in the billing block or the Head Credits, the "obligation" should be stated as "Producer's Discretion." The Distributor must be informed as soon as possible of any significant approvals required on Key Art, Photography, etc.

## 19. CREDIT STATEMENT ON DISKETTE

COMPUTER DISKETTE compatible with Microsoft Word containing the Credit Statement in Item #18.

## 20. BILLING BLOCK

Final BILLING BLOCKS for posters, video packaging, paid advertising, sales materials and trailers, approved by all parties (including Distributor), as well as camera-ready black & white stats of all the logos producer requires be included in the billing block. The final billing block must be signed off by licensor.

### 21. BILLING BLOCK ON DISKETTE
COMPUTER DISKETTE compatible with Microsoft Word containing the Billing Block in Item #20.

### 22. CAST/TALENT/PERSONNEL AGREEMENTS
Copies of fully executed AGREEMENTS for the writer, director, producer, composer and principal cast members, as well as all other cast members, talent and personnel whose names are accorded On-screen Head Credits, and/or appear in Paid Advertising credit and/or appear in the Billing Block.

### 23. CHAIN OF TITLE
A summary page outlining all Chain of Title documents, in chronological order, as well as all documents evidencing proof of ownership and all documents evidencing proof of payment in connection with any transfer of rights, including but not limited to:

    A filed United States COPYRIGHT REGISTRATION FORM for the screenplay
    A filed United States COPYRIGHT REGISTRATION FORM for the Production
    One (1) copy of COPYRIGHT SEARCH (if applicable)
    One (1) copy of TITLE SEARCH

### 24. FINAL CERTIFIED COST STATEMENT
A STATEMENT prepared by either a certified public accounting firm or production company auditor setting forth the actual negative cost of the Production.

### 25. DOLBY OR ANALOGOUS LICENSE
A copy of the executed LICENSE AGREEMENT in full force and effect between the producer and Dolby Laboratories, Inc. in connection with the Production, if applicable.

### 26. CAVCO or CRTC CERTIFICATES
Copies of the above, or proof of application until certificates are received.

### 27. PHOTOCOPY OF PASSPORTS OF DIRECTORS, PRODUCERS AND KEY CAST MEMBERS
Photocopy of PASSPORTS for all cast/crew members who anticipate festival/publicity travel, and for the purpose of determining an individual's nationality.

### 28. CO-PRODUCTION AGREEMENTS
A copy of any relevant Co-Production/Co-Financing AGREEMENTS where rights are carved out in perpetuity in certain territories (e.g. USA) to the co-producer.

***If not applicable, a signed statement to this effect.

### 29. CERTIFICATE OF AUTHORSHIP substantially in the form attached as Exhibit "B-1" to this Schedule "B", duly executed and notarized.

Section F:

## PUBLICITY MATERIALS

## GENERAL GUIDELINES

All photographic materials are to be no less than first generation, reproducible and high quality. Prints are to be 8 x 10 in size. No less than 50% of the key set is to be "action-oriented" photography.

All photographic selections must include corresponding photo credits and cut lines.

All original photography including negatives and contact sheets for review and/or duping purposes will be available to Distributor on a request basis

## 1.  PHOTOGRAPHY

A minimum of 75 color transparencies and 15 black and white prints including ensemble cast, relevant groupings and production shots as well as individual shots of each key cast member, plus a minimum of 6 gallery shots of each key cast member, director, and director with cast and/or crew. A captions sheet identifying cast/crew member and a short description of the scene involved. Access to contact sheets and original negatives.

## 2.  PRESS KIT MATERIAL

Two (2) copies as well as computer diskettes of the approved Press Kit. The Press Kit must include:

1) short            synopsis        (episodic        for        series)
2) long        form        synopsis        (episodic        for        series)
3) detailed   production  notes  (including   one-page   on   concept   of   show),
4) complete    biographies    of    key    cast    and    production    personnel
5) cast            and            production            credits
6) cover   page   identifying   the   name   of   the   production   &   the   Distributor   Logo

## 3.  PRESS CLIPPINGS

If available, copies of REVIEWS and articles published on Production and director, as well as INTERVIEWS with the director.

## 4.  KEY ART - TEXTLESS

If any KEY ART has been selected or used during production, then a textless copy of it is to be supplied. This includes any artwork used to create the title, or any promotional packaging.

<u>Section G:</u>

## <u>ACCESS REQUIREMENTS</u>

The Distributor requires access to Master and Sub-master elements including the right to remove those elements to a facility of their own choosing upon reasonable notice (10 days) for a period not more than 30 days. The Distributor requires access to the following elements:

ACCESS TO:

### ORIGINAL NEGATIVE
35MM (or 16MM) ORIGINAL NEGATIVE of the final Production. Including the final cut negative, EDL (Edit Decision List) on paper and diskette and any other original elements required to create the final masters.

### FINAL MIX
FINAL MIX elements in synch with the final Production. Including the original Dialogue, Music, Foley, ADR, (Post-sync recordings) and Sound Effects used in the creation of the final Mix.

### PRINT MASTER
Final 35mm 2-track stereo matrixed Print Master plus M.O. disk and 6+2 transfer.

### OUT TAKES AND TRIMS
Any unused Outs and Trims, and all other film, video and audio materials, including, without limitation, soundtracks (whether negative, positive or magnetic) produced for or used in the process of preparing the Production, whether or not actually used in the Production. Access to these materials to create alternative versions, should the need arise. The Distributor has the right to re-edit or remix the Production pursuant to the terms of the Agreement to which this Schedule is attached.

### WORK MATERIALS
Dailies Transfer Reels (if appropriate), Cutting Copies, Original Negative, D.A.T. (Or 1/4") SOUND ROLLS, (both location and ADR), Mix Elements, Original Music, Recording Cue Sheets, Promo Elements, ETC.)

Access to the Close Captioned Master.

### RE-RECORDING (DUBBING) CUE SHEETS
All original Dubbing Cue Sheets (music, dialogue, effects) including original ADR (Post Sync) recording cue sheets.

### NON-ORIGINAL LANGUAGE VERSIONS
Free access to all other LANGUAGE VERSIONS (dubbed and/or subtitled), as may be produced. Free access to all video versions, re-cuts, trailers, artwork or promotional materials created by other distributors or production parts now or in the future. Also, free access to any and all film, video and audio elements required to create alternative Language versions should the need arise.

### MARKETING MATERIALS
All original publicity and other still photography shot in connection with the Production including any slides, trailers, promos, Key Art etc created in the process.

### OTHER AGREEMENTS
All other agreements and documents relating to the Production, e.g. employment agreements, clearances, releases, location agreements (and evidence of payment in full with respect thereto) as may be required by Distributor.

# EXHIBIT B



June 1, 2004

AMENDMENT TO DISTRIBUTION AGREEMENT

Busted Tranny Productions Ltd.
113 – 1215 13th Street S.E.
Calgary, Alberta
T2G 3J4
Attention: Michael Dowse
Telecopier #: (403) 237-0146

Dear Michael:

### Re: *"FUBAR"*

Reference is made to the distribution agreement dated as of June 20, 2001 (the "Distribution Agreement"), between Busted Tranny Productions Ltd. (the "Producer") on the one hand, and Odeon Films, a division of Motion Picture Distribution LP, (the "Distributor") on the other, for the acquisition by Distributor of worldwide distribution and exploitation rights in and to the motion picture entitled *"FUBAR"* (the "Picture").

WHEREAS, for good and valuable consideration, the receipt of which is acknowledged by the parties, the parties now wish to amend the Distribution Agreement (the "Amendment") as follows;

1.      Paragraph 2 of the Distribution Agreement shall be deleted and replaced with the following:

"Producer hereby licenses to Distributor for a period commencing on the date hereof and ending 25 years from Delivery (the "Term") the rights set out in paragraphs 1 to 24 of the Standard Terms appended hereto as Schedule "A", throughout Canada, the U.S.A., the UK, Spain, France and Frenchspeaking Europe (the "Territory"). Notwithstanding the foregoing, the rights in France and Frenchspeaking Europe shall be limited to Pay-TV rights. At the end of the Term: (a) if Distributor has not yet recouped the Minimum Guarantee (as defined below), Distributor shall have the right to extend the Term for a further 25 year period on the basis described herein (but with no further minimum guarantee being payable); or (b) if Distributor has recouped the Minimum Guarantee, then Distributor will have the right of first negotiation (10 business days), last refusal (10 business days) to extend the Term for an additional 25 year period."

2.      All other provisions of the Distribution Agreement shall remain binding and are hereby ratified and confirmed.

If you are in agreement with the foregoing, please acknowledge your acceptance by executing this Amendment.

Yours truly,

ODEON FILMS, a division of
Motion Picture Distribution LP,
by its sole general partner,
Motion Picture Distribution Inc.

MOTION PICTURE DISTRIBUTION LP

121 Bloor Street East · Suite 1500 · Toronto · Ontario · Canada · M4W 3M5 · Tel 416.967.1174 · Fax 416.960.0971
www.allianceatlantisfilms.com

*Licensed from Alliance Atlantis Communications Inc., an indirect limited partner of Motion Picture Distribution LP, not a general partner.



Per: _____

**ACCEPTED AND AGREED TO:**

BUSTED TRANNY PRODUCTIONS LTD.

Per:

# EXHIBIT C

amazon.com

**amazon**
Try Prime

Your Amazon.com    Today's Deals    Gift Cards    Sell    Help

Shop by Department ▾    Search    All ▾    fubar blu    Go

Hello. Sign in Your Account ▾    Try Prime ▾

Movies & TV    New Releases    Best Sellers    Deals    Blu-ray    TV Shows    Kids & Family    Anime    All Genres    Amazon Instant Video    Prime Instant Video    Your Video Library    Trade-In

‹ Back to search results for "fubar blu"



Roll over image to zoom in

### NEW Fubar - Fubar (2004) (Blu-ray)

Andrew Sparacino (Actor), Dace Lawrence (Actor), Michael Dowse (Director)    Rated: R (Restricted)

Format: Blu-ray

Be the first to review this item

Price: **$19.38** & **FREE Shipping** on orders over $35. Details

**Only 2 left in stock.**

Sold by MEGA Media and Fulfilled by Amazon. Gift-wrap available.

**Arrives before Christmas**

**Want it Wednesday, Dec. 17?** Order within **19 hrs 50 mins** and choose **One-Day Shipping** at checkout. Details

15 new from $7.77    3 used from $15.73

| | | Amazon Price | New from | Used from |
|---|---|---|---|---|
| Blu-ray | 1-Disc Version | $19.38 | $7.77 | $15.73 |

Share

◉ Buy new

☐ Yes, I wan
   Shipping

[🛒 Add to Cart]

Turn on

◯ Buy used

Add to Wish

Sell yours for
We'll buy it for
Learn More

[Trade in now]

Other Sel

**$19.99**
& FREE Shippin
orders over $35.
Sold by: Ultimate

18 used & new f

Have one to sell

---

### Frequently Bought Together



Price for both: **$28.37**

[Add both to Cart]    [Add both to Wish List]

Show availability and shipping details

☑ **This item:** NEW Fubar - Fubar (2004) (Blu-ray) ~ Andrew Sparacino  Blu-ray  $19.38

☑ Fubar: Balls to the Wall [Blu-ray] ~ David Lawrence  Blu-ray  $8.99

# EXHIBIT D

# MINTZ LEVIN

Andrew D. Skale | 858 314 1506 | adskale@mintz.com

3580 Carmel Mountain Road, Suite 300
San Diego, CA  92130
858 314-1500
858 314-1501 fax
www.mintz.com

January 7, 2015

***VIA FACSIMILE and FEDERAL EXPRESS***

Sofia Tsachouridou
VP of Business and Legal Affairs
and
Greg White
Alliance Atlantis International Distribution, LLC
Echo Bridge Entertainment
75 Second Avenue, Suite 500
Needham, MA  02494
Fax:  781-444-6472

Re:   Underpayment of Royalties – "FUBAR"

Dear Ms. Tsachouridou and Mr. White:

Mintz Levin has been retained to represent Busted Tranny Productions Ltd. ("Busted Tranny" or "Producer") regarding the June 20, 2001 Agreement between Busted Tranny and Odeon Films Inc. ("Odeon") relating to the film FUBAR, as amended (referred to herein as "2001 Distributor Agreement").  It appears Alliance Atlantis International Distribution, LLC ("AAID") acquired Odeon Films, and then Echo Bridge Entertainment ("Echo") acquired the US distribution rights from AAID.  Yet, my client received a royalty statement in 2013 from AAID.  On top of that, it is unclear why when Xenon is responsible for DVD distribution, that Echo is selling DVD's of the movie at Walmart and Best Buy.  Accordingly, Busted Tranny needs clarification from you concerning who is responsible for the US distribution of the FUBAR film (including the DVD rights).

Busted Tranny has asked us to contract you regarding the extremely low royalties it has received concerning this film.  While the FUBAR film quickly rose to the status as a cult classic and has remained there, royalties paid under the 2001 Distribution Agreement have been abysmal.  Gross Receipts after deduction are nowhere near the levels they should be under Section 17 of Schedule A to the 2001 Distributor Agreement.  This is particularly so in light of Section 6 of Schedule A to the 2001 Distributor Agreement, which requires the Distributor to "in good faith distribute and exploit" the films and "use its best efforts to obtain as wide and complete distribution of the Production throughout the Territory as is reasonably possible consistent with sound business policy."  As you are aware, a best efforts clause requires far greater efforts than just good faith, and will be aggressively enforced by any court looking at the issue.

Moreover, the 2001 Distributor Agreement requires reporting to be provided to Busted Tranny at least semi-annually.  That has not occurred.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

BOSTON | LONDON | LOS ANGELES | NEW YORK | SAN DIEGO | SAN FRANCISCO | STAMFORD | WASHINGTON

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

January 7, 2015
Page 2


All that Busted Tranny is left to conclude in light of this situation is that you are either not performing your obligations, or that instead you are violating the Agreement by retaining Gross Receipts that belong to Busted Tranny.  Given that rights under the 2001 Distribution Agreement are exclusive rights, any failure to perform fully under the 2001 Distributor Agreement lays waste to the creative and extensive efforts used by Busted Tranny to develop a truly deserving cult film that has stood up to the test of time.

Please immediately provide (1) a detailed summary of the best efforts you have used in the past 4 years to obtain as wide and complete distribution of the FUBAR film as possible (including, without limitation, television, cable, video on demand, iTunes, home video, and the like), (2) a detailed summary of the best efforts that will be used over the following 2 years to obtain as wide and complete distribution of the FUBAR film as possible, and (3) a detailed accounting of all gross receipts and expenses concerning "the exhibition, distribution and exploitation" of the FUBAR film, as required under Section 16 of Schedule A to the 2001 Distributor Agreement.  .

These details are requested as soon as possible, but in no event later than **January 20, 2015**. Absent hearing from you, Busted Tranny will have no choice but to seek immediately relief via the courts.

This letter should not be construed as in any way limiting Busted Tranny's rights or remedies in this matter.  All such rights are expressly reserved.

We look forward to your prompt response.

Sincerely,

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Andrew D. Skale

ADS/kej

```
                    ***********************
                    ***   TX REPORT   ***
                    ***********************

        TRANSMISSION OK

        TX/RX NO              3118
        RECIPIENT ADDRESS     17814446472
        DESTINATION ID
        ST. TIME              01/07 15:58
        TIME USE              00'45
        PAGES SENT            3
        RESULT               OK
```

# MINTZ LEVIN

3580 Carmel Mountain Road, Suite 300
San Diego, CA  92130
858-314-1500
858-314-1501 fax
www.mintz.com

**Andrew D. Skale** | 858 314 1506 | adskale@mintz.com

# fax transmittal

## FROM:

**Name**      Andrew D. Skale

**Date**      January 7, 2015

**# of Pages**      3

## To:

| Name | Company | Bus | Fax # |
|------|---------|-----|-------|
| Sofia Tsachouridou<br>Greg White | VP of Business and Legal Affairs<br>Alliance Atlantis International<br>Distribution, LLC<br>Echo Bridge Entertainment<br>75 Second Avenue, Suite 500<br>Needham, MA  02494 | ι | (781) 444-6472 |

## Comments:

Please see the attached documents.

From: (858) 314-1500
Andrew Skale
Mintz Levin
3580 Carmel Mountain Road
Suite 300
San Diego, CA 92130

Origin ID: SANA



Ship Date: 07JAN15
ActWgt: 0.5 LB
CAD: 103966698/WSXI2750

J142214092303uv

SHIP TO: (858) 314-1500
**Sofia Tsachouridou**
**Alliance Atlantis Intl Distributi**
**75 2ND AVE STE 500**

**NEEDHAM HEIGHTS, MA 02494**

BILL SENDER

Delivery Address Bar Code

Ref # 48332.001
Invoice #
PO #
Dept #

RELEASE#: 3785346

**THU - 08 JAN 10:30A**
**PRIORITY OVERNIGHT**

TRK# **7725 0278 7083**
0201

**XE PMXA**

**02494**
MA-US
**BOS**



522G18F158AC9

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
FOLD on this line and place in shipping pouch with **bar code and delivery address** visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.